UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OPERATING ENGINEERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA, et al.,

Plaintiffs,

v.

JS TAYLOR CONSTRUCTION, INC., A CALIFORNIA CORPORATION, et al.,

Defendants.

Case No. 17-cv-00896-EMC

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, PARTIALLY GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND ORDERING DEFENDANTS TO SHOW CAUSE WHY SUMMARY JUDGMENT AS TO THE SECOND AUDIT SHOULD NOT ISSUE**

Docket Nos. 47, 56

## I.  INTRODUCTION

Plaintiffs are multiemployer benefits plans and their respective trustees, who have filed suit against JS Taylor Construction, Inc. (a corporation) and Joshua Thiel (a principal shareholder). The suit alleges a breach of the parties' collective bargaining agreement, and Plaintiffs seek unpaid contributions, interest, liquidated damages, and other relief.  Defendants filed a Motion for Summary Judgment, arguing that Mr. Thiel cannot be held personally liable for the obligations of JS Taylor.  Plaintiffs filed a Cross Motion for Summary Judgment, seeking an order from the Court directing Defendants to pay the outstanding benefit contributions, interest, and liquidated damages, as well as attorneys' fees and costs.

## II.  BACKGROUND

A.  Factual Background

"This action arises under the Employee Retirement Income Security Act of 1974 ('ERISA') and out of an alleged breach of a collective bargaining agreement ('CBA') for unpaid

contributions." Defendant's Motion for Summary Judgment ("Mot.") at 1, Docket No. 47. "Plaintiffs are multiemployer employee benefit plans and their respective trustees" (collectively "Plaintiffs"). Opposition and Cross Motion for Summary Judgment ("Opposition") at 2, Docket No. 56. Defendants are JS Taylor Construction, Inc., a California corporation, and Joshua Thiel, an individual. Complaint at 1, Docket No. 1. Mr. Thiel was the sole proprietor of JW Taylor (a sole proprietorship) and is now a principal shareholder of JS Taylor Construction (a corporation). Opposition at 10–11.

In July 2014, Defendant Thiel entered into the Independent Northern California Construction Agreement ("Independent Agreement") with the Union on behalf of JW Taylor Construction. Opposition at 2 (citing Declaration of Nate Tucker ("Tucker Decl.") ¶ 2, Docket No. 60; Declaration of Dan Reding ("Reding Decl.") ¶ 2, Docket No. 58). That Agreement "incorporates the Master [Bargaining] Agreement" between the Union and several contractor groups. Complaint at 3. The Master Bargaining Agreement in turn incorporates the Trust Agreements, under which Defendants were "required to pay certain contributions to: the Operating Engineers' Vacation and Holiday Pay Plan; Contract Administration Fund; Job Placement Center and Market Area Committee Administration Market Preservation Fund; Industry Stabilization Fund; and Business Development Trust Fund." *Id.* at 4. The Agreement also "require[d] Defendants to pay . . . contributions to . . . the Union for union dues, . . . plus liquidated damages and interest on late-paid fringe benefit contributions, plus attorneys' fees and costs." Opposition at 1. The debts allegedly owed were incurred only by JS Taylor, the corporate entity that JW later became.

At the time he entered into the Independent Agreement (July 2014), Mr. Thiel "advised the Union that he would be incorporating his business and would notify the Union once he had incorporated." Opposition at 2 (citing Tucker Decl., ¶ 3). In December 2014, "JW Taylor Construction stopped doing business." Mot. at 3 (citing Haefele Declaration ("Haefele Decl."), Exh. G ("Thiel Depo.") at 53:10–25; 54:1–9, Docket No. 69). The following month, JS Taylor "started doing business" and Mr. Thiel informed the union that JS Taylor "was taking over for JW Taylor Construction." *Id.* Defendants state that, upon receiving this information from Mr. Thiel,

the Union "simply changed the employer name in their system . . . and began accepting monthly contribution payments from [JS Taylor]" rather than having Mr. Thiel "re-sign the Independent Agreement on behalf of [JS Taylor]." *Id.*

During this transition, neither JS Taylor nor JW Taylor was purchased by or merged with the other entity. Defendant's Reply in Support of Motion for Summary Judgment ("Reply") at 3, Docket No. 67. JS Taylor was never paid to complete work that JW Taylor was hired to perform. Thiel Depo. at 35. Nor did JS Taylor buy or acquire equipment or tools from JW Taylor. *Id.* at 30–32. However: (1) Mr. Thiel put the Union on "early notice that Mr. Thiel was going to be incorporating," Reply at 6; (2) he also stated in his deposition that "when JW ceased to exist, JS -- JS took over," Thiel Depo. at 23; (3) Mr. Thiel also testified that employees were "transferred" from JW Taylor to JS Taylor, *id.* at 58; (4) Mr. Thiel believes that JS Taylor is obligated to make trust fund contributions because of the bargaining agreement [which had been signed previously only on behalf of JW Taylor], *see id.* at 37; (5) ownership of the entities was largely identical: Mr. Thiel went from sole proprietor of JW Taylor to principal shareholder of JS Taylor, *see id.* at 27; and (6) the addresses of the two entities were the same, namely Mr. Thiel's home address, *see id.* at 54.

Plaintiffs assert that "by early 2017, Defendants had become delinquent in their contribution payments." Mot. at 3–4 (citing Haefele Decl., Ex. I, Plaintiffs' Response to Defendant's Interrogatories, Set One ("PRDI") at 7–8, Docket No. 69). Specifically, Plaintiffs allege unpaid contributions now at issue were owed by JS Taylor for "February through April, and July through November 2016; and January 2017." Complaint at 5. Plaintiffs assert one cause of action against Defendants, Mot. at 2, contending that Defendants have "breached the Bargaining and Trust Agreements and are in violation of ERISA § 515, 29 U.S.C. § 1145, and [the Labor Management Relations Act ("LMRA")] § 301(a)," Complaint at 5.

Plaintiffs seek "any unpaid contributions, due at time of Judgment," "liquidated damages on all late-paid and unpaid contributions," "interest on all late-paid and unpaid contributions," and "reasonable attorneys' fees and costs of this action, including any audit fees." Complaint at 6–7. Defendants, on the other hand, argue that Mr. Thiel has no liability for JS Taylor's unpaid

contributions or any related payments because he only signed the Independent Agreement on behalf of JW Taylor, a sole proprietorship, which ceased doing business in 2014.  Mot. at 4.  Because Mr. Thiel never signed a new Agreement with the Union after JS Taylor incorporated and began doing business, he argues that he is not personally liable for the unpaid contributions owed by JS Taylor.  *Id.*

Plaintiffs contend that Mr. Thiel "personally guaranteed all amounts" owed, *i.e.*, the contributions and other moneys which accrued against JS Taylor, pursuant to the Independent Agreement.  Complaint at 4; Mot. at 2.  They rely on Paragraph 12 of the Independent Agreement, which states:

> If the Individual Employer is a corporation, its principal shareholder(s) or if the individual Employer is a partnership, its general partners personally guarantee all payment of wages and fringe benefits, including fringe benefit contributions, liquidated damages, interest and collection costs, including, but not limited to, attorney's fees and auditor/accountant fees.

Tucker Decl., Exh. A at 1, Docket No. 60-1.  However, Mr. Thiel disputes the imposition of personal liability because JW Taylor was never a corporation or a partnership, and Paragraph 12 does not impose individual liability on sole proprietors.  Mot. at 6–8.  In addition, Mr. Thiel never signed a subsequent agreement subjecting himself to personal liability for JS Taylor's corporate obligations.  *Id.* at 4.

## III.     DISCUSSION

A.     Legal Standard

1.     Motion for Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment shall be rendered on a claim or defense, or part of a claim or defense, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it could affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict" for either party.  *Id.*  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the

jury could reasonably find for the [non-moving party]." *Id.* at 252. On a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party, drawing all justifiable inferences in that party's favor. *Id.* at 255.

The party moving for summary judgment always bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the movant also bears the ultimate burden of proof at trial, it can meet this initial burden of production by "com[ing] forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). This requires the movant to affirmatively demonstrate that there is no genuine dispute as to every essential element of its claim. *See River City Mkts., Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1462 (9th Cir. 1992). In contrast, where the movant does not bear the ultimate burden of proof, it can meet its initial burden by demonstrating the non-moving party's failure "to make a showing sufficient to establish the existence of an element essential to [the non-moving party's] case." *Celotex*, 477 U.S. at 322. Once the movant meets its initial burden of production, the burden shifts to the non-moving party to "produce evidence to support its claim or defense." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000). "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* (citing *Celotex*, 477 U.S. at 322). Conversely, if the nonmoving party "produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Id.*

In resolving a summary judgment motion, the court "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment"; it is not the court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citation omitted).

### 2. Contract Interpretation

The Court applies federal common law when deciding cases under ERISA. *See, e.g.*, *Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496, 1500 (9th Cir. 1984) ("The courts are

directed to formulate a nationally uniform federal common law to supplement the explicit provisions and general policies set out in ERISA, referring to and guided by principles of state law when appropriate, but governed by the federal policies at issue."); *see also Hamner v. Unum Life Ins. Co. of Am.*, No. C 96-1973 TEH, 1997 WL 257515, at *4 (N.D. Cal. May 6, 1997) (recognizing "uniform federal common law informing interpretation of ERISA governed insurance contracts" (internal quotation marks omitted) (citing *Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382, 386 (9th Cir.1994))). "Interpretation of a contract is a matter of law, including whether [a] contract is ambiguous." *United States v. King Features Entm't, Inc.*, 843 F.2d 394, 398 (9th Cir. 1988)*; see also Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 871 (9th Cir. 1979) ("the determination of whether a written contract is ambiguous is a question of law that must be decided by the court").

A court seeking "to ascertain the meaning of [an ambiguous] collective bargaining agreement" must "first examine its express written terms." *Nw. Administrators, Inc. v. B.V. & B.R., Inc.*, 813 F.2d 223, 225 (9th Cir. 1987). When that language is unclear, "the court must determine the 'parties' actual intent' at the time of the agreement's execution." *Id.*at 226. "When a plan is ambiguous a court may, and usually does, consider extrinsic evidence to interpret it." *Hamner v. Unum Life Ins. Co. of Am.*, No. C 96-1973 TEH, 1997 WL 257515, at *4 (N.D. Cal. May 6, 1997). The Ninth Circuit has explained: "If we find a contract to be ambiguous, we ordinarily are hesitant to grant summary judgment because differing views of the intent of parties will raise genuine issues of material fact. This circuit has not, however, adopted a rigid rule prohibiting reference to extrinsic evidence in resolving a contractual ambiguity on a summary judgment motion." *San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*, 132 F.3d 1303, 1307 (9th Cir. 1997). Where the parties' "actual intent raises issues of material fact" even after reference to extrinsic evidence, summary judgment is improper. *Nw. Administrators* at 226. However, as *San Diego Gas & Electric* instructs, in the absence of ambiguity which persists after considering the extrinsic evidence, summary judgment may be appropriate.

B.        Analysis

    1.        Mr. Thiel's Personality Liability for JS Taylor's Obligations

The first key issue is whether Mr. Thiel can be held personally liable for the obligations of JS Taylor, the corporation.  Normally, when a sole proprietorship incorporates and "cease[s] to be the employer," the corporation alone becomes "responsible for the unpaid contributions after it became the employer."  *Operating Engineers Pension Tr. v. Reed*, 726 F.2d 513, 515 (9th Cir. 1984).  Here, JW Taylor—the sole proprietorship—stopped doing business in December 2014.  Thiel Depo. at 53, 54.  It also ceased having employees at that time.  *Id.* at 53–54.[1]  JS Taylor—the corporation—began performing work the following month in January of 2015.  *Id.* at 25.  JS Taylor did not take over any projects from JW Taylor.  Around the time JS Taylor began performing work, Mr. Thiel notified the Union that his business had been incorporated and was changing its name to JS Taylor Construction.  *Id.* at 57.  Thus, it would appear at first blush that Mr. Thiel—in his role as sole proprietor of JW Taylor—bears no responsibility for the unpaid contributions of JS Taylor.

However, the Ninth Circuit has recognized that "special circumstances" (such as a contract that modifies the normal rules) may sometimes compel a different outcome.  *Reed*, 726 F.2d at 515.  Here, the parties disagree as to the effect of the Independent Agreement.  The parties focus on the text of Paragraph 10 of the Independent Agreement.  That paragraph provides:

> If the Individual Employer sells or transfers any or all of its assets, stock, and/or operations, it will provide as a term of the sale or transfer that the buyer or transferee shall recognize the Union as the Employees' bargaining agent and will assume this Agreement.

Independent Agreement ¶ 10.  Plaintiffs argue that "once [Mr. Thiel] transferred JW Taylor's operations to JS Taylor, JS Taylor assumed all of the terms of the Independent Agreement."  Opposition at 12.  Once there is a transfer of the Independent Agreement to JS Taylor, the corporation, Paragraph 12 of the Agreement imposes personal liability for the payment of wages and fringe benefits onto the principal shareholder(s) of the corporation.  Paragraph 12 states: "If

---

[1] However, it does still have an active license.  *Id.* at 53.

the Individual Employer is a corporation, its principal shareholder(s) . . . personally guarantee all payment of wages and fringe benefits, including fringe benefit contributions, liquidated damages, interest and collection costs, including, but not limited to, attorney's fees and auditor/accountant fees." Independent Agreement ¶ 12.

Defendants counter that Paragraph 10 is ambiguous and cannot be applied. Defendants also contend there is no evidence that JW Taylor transferred operations to JS Taylor.[2] Reply at 8. Defendants also assert that Paragraph 12 is inapplicable because "JW Taylor and [JS Taylor] are separate entities," Reply at 3, and the Independent Agreement was never "signed by an officer of [JS Taylor] on behalf of [JS Taylor]," Reply at 4.

As to ambiguity, a court seeking "to ascertain the meaning of [an ambiguous] collective bargaining agreement" must "first examine its express written terms." *Nw. Administrators*, 813 F.2d at 225. When that language is unclear, "the court must determine the 'parties' actual intent' at the time of the agreement's execution." *Id.* at 226. Defendants argue that the contract is ambiguous because "[a]pplied literally, [the successor clause] would require any transferred 'operation' of JW Taylor (which could include *any* operation performed outside of the Union's Northern California territory—e.g. accounting duties, tool or equipment transfers, human resources, leased space, etc.—whether it has to do with activities covered by the CBA or not) to require the new buyer or transferee to assume the Independent Agreement." Reply at 8. However, the hypothetical transfer situations discussed by Defendants are a far cry from the situation before this Court. JW Taylor did not transfer a small subset of its operations outside of the Union's territory. To the contrary, JW Taylor informed the Union of its intent to incorporate, did incorporate, and then the new corporate entity continued to conduct the same type of business under essentially the same leadership with many of the same employees. Thus, whatever the precise contours of the term "transfers," the term encompasses the continuance of core operations

---

[2] Defendants object to this argument on the grounds that Plaintiffs had previously identified only Paragraph 12 as the basis for personal liability. No mention was made of ¶ 10 being a predicate to the application of ¶ 12. However, Defendants had fair notice of this theory because (1) the transfer of obligations between JW Taylor and JS Taylor is the very heart of this case, (2) interrogatory questions examined the Independent Agreement and which entities were bound by it, and (3) Mr. Thiel spoke about transferring his business during his deposition.

by a new entity located at precisely the same address with substantially similar ownership and overlapping employees as the old entity. In particular, as noted above, (1) Mr. Thiel put the Union on "early notice that Mr. Thiel was going to be incorporating," which informed the Union that it would be dealing with a different entity in the future; (2) he also stated in his deposition that "when JW ceased to exist, JS – JS took over" (Thiel Depo. at 23); (3) Mr. Thiel testified that employees were "transferred" from JW Taylor to JS Taylor (*id.* at 58); and (4) Mr. Thiel believes that JS Taylor is obligated to make trust fund contributions because of the bargaining agreement (which was signed only on behalf of JW Taylor), *see id.* at 37. Indeed, once incorporation had been finalized and the Union notified, JS Taylor began making contributions to the trust funds. *Id.* Thus, JW Taylor and JS Taylor recognized the transfer of obligations owed to the Trust Fund.

This recognition and performance of obligations to the Trust Funds by JS Taylor not only establishes there was a "transfer" under Paragraph 10, it also independently establishes a contractual obligation through JS Taylor's course of conduct. "A contract may be formed in any manner sufficient to show a meeting of the minds of the parties, including conduct by both parties that recognizes the existence of an agreement," *Avel Pty. Ltd. v. Breaks*, 985 F.2d 571 (9th Cir. 1993).

Under these circumstances, to conclude otherwise would permit "a company can rid itself of a bothersome set of labor obligations merely by arranging for its management employees to execute a few legal documents." *Hardin's Bakery, Inc. v. Retail, Wholesale, & Dep't Store Union, AFL-CIO*, 877 F.2d 1541, 1549 (11th Cir. 1989), *reh'g granted and opinion vacated*, 893 F.2d 1188 (11th Cir. 1990) (Kravitch, J., dissenting).

Having established the undisputed evidence establishes there was a "transfer" of JW Taylor's operations to JS Taylor under any reasonable interpretation of Paragraph 10, Paragraph 12 applies. Under Paragraph 12, there is no question that Mr. Thiel is a "principal shareholder" of JS Taylor. He is the sole owner. Mr. Thiel is thus personally liable as guarantor of JS Taylor's obligations to pay all wages and fringe benefits.

To the extent that Defendants argue that personal liability for JS Taylor's obligations cannot be imposed on Mr. Thiel in the absence of a new Independent Agreement *signed* by Mr.

Thiel in his role as principal shareholder of JS Taylor, the argument is unavailing. It is true that "where courts have considered whether to uphold personal liability provisions in collective bargaining agreements, the question of whether the officer at issue signed the contract has been a key consideration." *Employee Painters' Tr. Health & Welfare Fund v. Landon Const. Grp.*, No. C11-0068-JCC, 2011 WL 5864648, at *3 (W.D. Wash. Nov. 22, 2011). But the undisputed facts establish the application of ¶ 12 here. Moreover, cases have emphasized that notice is the main factor in looking to a signature. *See, e.g.*, *Employee Painters' Tr. v. J & B Finishes*, 77 F.3d 1188, 1192 (9th Cir. 1996) (enforcing personal liability on signatory who was "familiar with the basic operation of counterpart agreements"); *Employee Painters Tr. Health & Welfare Fund v. Pro-Tec Fireproofing, Inc.*, No. C06-1267RSL, 2008 WL 5262775, at *2 (W.D. Wash. Dec. 16, 2008) (declining to impose personal liability where another party signed the agreement and defendant had not seen the document at the time it was signed). In this case, Mr. Thiel signed the Agreement in his role as sole proprietor of JW Taylor, and obviously had notice of the Agreement and its personal liability provision. The lack of his formal signature as principal shareholder of JS Taylor does not negate his liability here.

The Court **DENIES** Defendant's Motion for Summary Judgment.

2. Plaintiffs' Cross Motion for Summary Judgment

Plaintiffs bring a Cross Motion for Summary Judgment. *See* Docket No. 56. As noted above, the undisputed evidence establishes Mr. Thiel's personal liability for payments due under the Independent Agreement as a matter of law.

Based on their own records, Plaintiffs seek $172,357.03 in unpaid contributions, liquidated damages, and interest from Defendants. Opposition at 8. In addition, as a result of two payroll-inspection audits, Plaintiffs seek to recover from Defendants' additional unpaid contributions, liquidated damages, and interest in the amount of $464,513.23 (covering a time period from October 2014 to March 2019). Opposition at 8. They also seek $99,332.11 in attorneys' fees and costs. *Id.* at 7–8.

a. Plaintiffs' Claims Based on Internal Records (Non-Audit Claims)

Plaintiffs seek contributions and compensation based on two audits, as well as

contributions based on Plaintiffs' own recordkeeping (*i.e.* records independent of the audits).

Looking first to the compensation Plaintiffs seek as a result of their own recordkeeping, the claim

is for $172,357.03 in unpaid contributions, liquidated damages, and interest for numerous months

between July 2015 and December 2018. Opposition at 7–8. The breakdown is as follows:

| Work Month | Unpaid Contributions | Liquidated Damages[4] | 10% Interest (through 8/22/19) | Subtotals |
|---|---|---|---|---|
| July, 2015 | $0 | $1,643.82 | $0 | $1,643.82 |
| September, 2015 | $0 | $3,816.64 | $0 | $3,816.64 |
| October, 2015 | $0 | $3,014.57 | $0 | $3,014.57 |
| November, 2015 | $0 | $3,514.12 | $0 | $3,514.12 |
| December, 2015 | $0 | $2,885.59 | $0 | $2,885.59 |
| January, 2016 | $0 | $1,910.32 | $0 | $1,910.32 |
| February, 2016 | $0 | $4,949.54* | $0 | $4,949.54 |
| March, 2016 | $0 | $5,312.60* | $927.17 | $6,239.77 |
| April, 2016 | $0 | $3,029.94* | $1,195.37 | $4,225.31 |
| June, 2016 | $0 | $2,196.03 | $24.07 | $2,220.10 |
| July, 2016 | $0 | $6,128.75* | $1,645.53 | $7,774.28 |
| August, 2016 | $0 | $5,203.05* | $1176.03 | $6,379.08 |
| September, 2016 | $0 | $5,945.51* | $1,099.51 | $7,045.02 |
| October, 2016 | $0 | $3,586.68* | $510.98 | $4,097.66 |
| November, 2016 | $0 | $2,946.21* | $298.66 | $3,244.87 |
| February, 2017 | $0 | $656.99* | $0.90 | $657.89 |
| March, 2017 | $0 | $170.11* | $36.12 | $206.23 |
| June, 2017 | $0 | $1,840.54* | $7.56 | $1,848.10 |
| August, 2017 | $0 | $280.96* | $38.10 | $319.06 |
| September, 2017 | $0 | $4,019.87* | $99.09 | $4,118.96 |
| October, 2017 | $0 | $461.83* | $27.20 | $489.03 |
| January, 2018 | $0 | $1,702.13* | $41.97 | $1,744.10 |
| April, 2018 | $0 | $66.44* | $4.73 | $71.17 |
| May, 2018 | $0 | $9,866.38* | $230.58 | $10,096.96 |
| July, 2018 | $0 | $11,378.93* | $343.13 | $11,722.06 |
| August, 2018 | $0 | $13,727.89* | $357.3 | $14,085.19 |
| September, 2018 | $12,044.39 | $14,387.04* | $4,656.72 | $31,088.15 |
| October, 2018 | $8,203.52 | $2,186.83* | $745.23 | $11,135.58 |
| November, 2018 | $16,300.93 | $3,260.19* | $1,067.38 | $20,628.50 |
| December, 2018 | $0 | $1,069.61* | $115.75 | $1,185.36 |
| **Subtotals:** | **$36,548.84** | **$121,159.11** | **$14,649.08** | **$172,357.03** |

*Id.* Thus, unpaid contributions amounts to $36,548.84 (which came due after the lawsuit was filed

in 2017), while the bulk of what is sought (pursuant to Plaintiffs' records) is liquidated damages

and interest. Defendants do not appear to dispute the unpaid contributions from September,

October, and November of 2018 or the interest owed from various months (neither category is

objected to in Defendants' opposition brief and neither was specifically objected to at the hearing).

Instead, Defendants object to the imposition of liquidated damages.

Defendant first lodges evidentiary objections to these claims. Opposition to Plaintiffs'

Cross Motion for Summary Judgment ("CMSJ Opp.") at 2–6, Docket No. 68. In particular,

Plaintiffs rely on a declaration by Ryan Ilacqua (the VP for a third-party administrator for the

funds) to substantiate the information in the above table. Declaration of Ryan Ilacqua ("Ilacqua

Decl."), Docket No. 61. Mr. Ilacqua explains throughout his declaration: "Since these

contributions became delinquent after Counsel for the Trust Funds filed the Complaint in this

matter, Counsel calculated liquidated damages at 20%." *See, e.g.*, Ilacqua Decl. ¶ 28 (repeated through declaration). Defendants contend that "Mr. Ilacqua provides no foundation or basis for knowing what Counsel for the Trust Funds might have done, including calculating liquidated damages at 20%. Further, this is inadmissible hearsay without any readily apparent exception." CMSJ Opp. at 5. However, at the summary judgment stage, evidence need not be presented in an admissible form, as long as it could be presented in such a form at trial. *See Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001). Mr. Ilacqua has sufficient knowledge to lay a foundation for the information in his declaration. He collects contribution reports, works with Plaintiffs' Benefit Administrator computer system, and is familiar with the Delinquency Collection Procedures. *See, e.g.*, Ilacqua Decl. ¶¶ 1, 18, 22. It is likely that his records (which are received by employers on a monthly basis) would be admissible through the business records exception. Thus, the Court rejects Defendants' evidentiary objections.

Plaintiffs seek liquidated damages that fall into three camps: (1) liquidated damages (assessed at 10%) for contributions that were late, but paid prior to the filing of this lawsuit, (2) liquidated damages (assessed at 20%) for contributions that were late and unpaid as of the filing of this lawsuit, and (3) liquidated damages (assessed at 20%) for contributions that came due after the filing of this lawsuit. Opposition at 7; *see also* Ilacqua Decl. at 18.

### i.     Category 1

With respect to the first category, Plaintiffs do not seek statutory liquidated damages of 20%, but only liquidated damages of 10% pursuant to the terms of the Master Agreements. *See* Opposition at 7–8; Reply at 9. This is consistent with current practice in the Northern District of California, wherein "[C]ourts award damages on contributions that were paid, but paid late on the basis of contract law and federal common law rather than ERISA statutory law." *Bd. of Trustees of Laborers Health & Welfare Tr. Fund for N. California v. Perez*, No. C-10-2002 JSW JCS, 2011 WL 6151506, at *11 (N.D. Cal. Nov. 7, 2011), *report and recommendation adopted as modified sub nom. Bd. of Trustees of Laborers Health v. Perez*, No. C 10-02002 JSW, 2011 WL 6149518 (N.D. Cal. Dec. 12, 2011). The Master Agreements provide for liquidated damages assessed at 10% of unpaid contributions. Tucker Decl., Exhs. B and C ("Master Agreements"), §12.13.01

("the amount of liquidated damages . . . resulting from any Individual Employer's default . . . shall be 10% of the unpaid contributions as of the delinquent date"). Thus, the parties' contracts entitle Plaintiffs to 10% liquidated damages for the months of July, September, October, November, and December of 2015, as well as January and June 2016. *See* Opposition at 8. As a result, the Court **GRANTS** Plaintiffs' Motion as it pertains to the liquidated damages associated with contributions that were late but paid prior to the filing of this lawsuit (assessed at 10%).

ii.   <u>Category 2</u>

Next, the Court turns to the second category of liquidated damages: those assessed for contributions that were late and unpaid as of the filing of this lawsuit. Plaintiffs seek liquidated damages assessed at 20% for this category, claiming both a statutory and contractual basis for doing so. *See* 29 U.S.C. 1132(g) (when "a judgment in favor of the plan is awarded, the court shall award the plan . . . liquidated damages provided for under the plan in an amount not in excess of 20 percent"); Reding Decl. ¶ 10 (citing Sections 12.13.01-12.13.0 of each Master Agreement ("if a lawsuit to collect delinquent contributions has been filed, the amount of liquidated damages on the unpaid contributions shall be increased to an amount equal to the greater of 20% of the unpaid contributions")).

Taking the statutory basis first, "[i]t is settled Ninth Circuit law that [ERISA's liquidated damages] provision is mandatory and not discretionary." *Operating Engineers Pension Tr. v. Beck Eng'g & Surveying Co.*, 746 F.2d 557, 569 (9th Cir. 1984). To receive liquidated damages pursuant to this provision, three requirements must be met: "(1) the fiduciary obtains a judgment in favor of the plan, (2) *unpaid* contributions exist at the time of suit, and (3) the plan provides for liquidated damages." *Idaho Plumbers & Pipefitters Health & Welfare Fund v. United Mech. Contractors, Inc.*, 875 F.2d 212, 215 (9th Cir. 1989). At the time Plaintiffs filed their complaint in February 2017, they alleged that unpaid contributions were owed for "February through April, and July through November 2016; and January 2017." Complaint at 5. Through the declaration of Mr. Ilacqua (the VP for a third-party administrator for the funds), Plaintiffs have provided evidence that unpaid contributions did exist at the time of the lawsuit. *See* Ilacqua Decl. ¶¶ 42–44, 46–50 (addressing all aforementioned months, except January 2017). As noted in the previous

13

section, a judgment will also issue in favor of Plaintiffs as to unpaid contributions at the time of the suits. This fulfills requirements (1) and (2) of the *Idaho Plumbers* framework. Requirement (3) is also fulfilled as the Master Agreements contemplate liquidated damages. This result is in line with the decision of other courts. *See, e.g.*, *Trustees of Bricklayers Local No. 3 Pension Tr. v. Huddleston*, No. 10-1708 JSC, 2013 WL 2181532, at *5 (N.D. Cal. May 20, 2013) (citing *Bd. of Trs. of Laborers Health & Welfare Trust Fund for N. Cal. v. Perez,* 2011 WL 6151506, at * 11 (N.D.Cal. Nov.7, 2011)).

Even if ERISA did not compel statutory liquidated damages, "a court may still enter judgment including liquidated damages pursuant to contract as mandated by federal common law." Opposition at 19. For such a contractual provision to be enforceable, "the harm caused by a breach must be very difficult or impossible to estimate. . . [And] the amount fixed must be a reasonable forecast of just compensation for the harm caused." *Idaho Plumbers & Pipefitters Health & Welfare Fund v. United Mech. Contractors, Inc.*, 875 F.2d 212, 217 (9th Cir. 1989). With respect to the first prong, courts have repeatedly held that "[w]hen an employer is delinquent in paying contributions into a fringe benefit trust fund, the fund suffers some kinds of harms that are very difficult to gauge." *Bd. of Trustees v. Udovch*, 771 F. Supp. 1044, 1049 (N.D. Cal. 1991). Thus, it appears that the first prong has been fulfilled. With respect to the second prong, courts look to whether Plaintiffs made "a good faith attempt to set an amount equivalent to the damages they anticipate." *Idaho Plumbers*, 875 F.2d at 217. Here, Plaintiffs explain that their auditor conducted a study in 2009 in order "to evaluate the harm caused to the Trust Funds by delinquencies and devise percentage amounts of liquidated damages that bore a rational relationship to the harm." *See* Declaration of Michele Stafford ("Stafford Decl.") ¶ 6, Docket No. 59. The results of that study led to Plaintiffs' approval "of liquidated damages to be assessed in the event an individual employer is delinquent, including the 20% to be assessed when a lawsuit must be filed to collect delinquent contributions." *Id.* In addition, 20% is in line with the statutory maximum contemplated by ERISA. *See* 29 U.S.C. 1132(g). This suggests that Plaintiffs' liquidated damages provisions were intended to compensate them for the challenges that accompany recouping unpaid contributions; thus, the second prong is also fulfilled.

Thus, the Court **GRANTS** Plaintiffs' Motion as it pertains to the liquidated damages associated with contributions that had come due but were unpaid at the time the lawsuit was filed.

### iii.    Category 3

The Court turns to the third category of liquidated damages: those assessed for contributions that came due *after* the filing of this lawsuit. While Defendants are correct that the Ninth Circuit has not "has not addressed whether ERISA allows damages for contributions that became delinquent after the filing of an action," CMSJ Opp. at 8, district courts have frequently decided that—for reasons of efficiency—it is appropriate to award damages for contributions that became delinquent after the filing of an action. *See Trustees of Bricklayers Local No. 3 Pension Tr. v. Huddleston*, No. 10-1708 JSC, 2013 WL 2181532, at *4 (N.D. Cal. May 20, 2013) ("the Court notes that while some of the liquidated damages were incurred after the filing of this lawsuit, the Court may nonetheless award Plaintiffs those damages"); *see also Roofers Local Union No. 81 v. Wedge Roofing, Inc.*, 811 F. Supp. 1398, 1402 (N.D. Cal. 1992) ("In order to accomplish the policy goals of 29 U.S.C. 1132 in a fair and efficient manner, this court, thus, will allow Plaintiff Trust Funds to recover unpaid contributions which came due after the lawsuit was filed."). The Court agrees and reaches the issue of liquidated damages assessed for contributions that came due after the filing of this lawsuit.

Defendants offer no objection to these liquidated damages aside from noting (1) that the Ninth Circuit has not addressed this issue specifically, and (2) that Defendants believe several equities-based reasons counsel against imposition of these damages. With respect to the latter point, Defendants first contend that, just prior to the filing of the Complaint, Plaintiffs "were in the final stages of completing the paperwork (conditional releases) necessary to receive . . . [a] check for over $211,000" that would have "satisfied all outstanding principal contributions, leaving only liquidated damages, interest and attorneys fees as the outstanding issues." CMSJ Opp. at 11. As a result, they argue there was no need to maintain this lawsuit and that Plaintiffs filed it simply to claim the "20% liquidated damages that they claim they are entitled to once a lawsuit is filed." *Id.* at 11–12. Plaintiffs respond (1) that the "payment had not been promised and was uncertain, thus resulting in the filing of the Complaint," (2) that the possibility of an imminent payment is

irrelevant because "Plaintiffs were entitled to file their Complaint the day Defendants' contributions were not paid timely," and (3) additional amounts were still owed, above and beyond the amount of the check. Plaintiffs' Reply at 11–12. These facts are not disputed. Plaintiffs thus had good reason to file a lawsuit, and the Court rejects the argument that the possibility of an impending payment obviated the need for this lawsuit.

Defendants also argue that "Plaintiffs' claims were settled in June 2017 with an attorney who is no longer in the employ of Plaintiffs' counsel's law firm. Had Plaintiffs' counsel memorialized the settlement agreement at or near that time, there would have been no need to incur litigation fees after June 2017." *Id.* at 12. Plaintiffs respond that Defendants never actually settled the case by remitting any payment and that they have instead prolonged the need for litigation by failing to pay benefit contributions beyond the time of the purported settlement agreement. Plaintiffs' Reply at 12. As with the previous point, Defendants' actions appear to undermine their own argument; the possibility of a tentative settlement agreement does not prohibit the Court from imposing liquidated damages. As a result, the Court **GRANTS** Plaintiffs' Motion as it pertains to liquidated damages for contributions that came due after the filing of this lawsuit.

In addressing the awards Plaintiffs are seeking based on their own recordkeeping, the Court must also address the unpaid contributions and interest claimed (in addition to the liquidated damages discussed above). As noted above, courts—in the interest of ensuring fair and efficient adjudication of claims—have allowed Trust funds to "recover unpaid contributions which came due after the lawsuit was filed." *Wedge Roofing*, 811 F. Supp. at 1402. Plaintiffs claim $36,548.84 in unpaid contributions for the months of September, October, and November of 2018. *See* Mot. at 8. Defendants do not dispute this amount in their response, aside from noting that "the Ninth Circuit has not addressed whether ERISA allows damages for contributions that became delinquent after the filing of an action, and the district courts are split on this issue." CMSJ Opp. at 8. In the absence of any additional objection from Defendants, the Court **AWARDS** Plaintiffs these unpaid contributions.

Similarly, Plaintiffs also seek to collect the interest accrued by Defendants on their unpaid

contributions (at a rate of 10% from the date that each contribution became delinquent through the date it was paid in full).  See Opposition at 8.  Plaintiffs note: "Pursuant to the Master Agreements and Trust Agreements, interest accrues on the delinquent unpaid contributions at ten percent (10%) per annum calculated from the day fringe benefit contributions are considered delinquent . . . until paid."  Opposition at 4; *see also* Tucker Decl. ¶ 11 (citing Section 12.13.01-12.13.02 of the Master Agreements).  Plaintiffs also note that parties may recover interest on any unpaid contributions pursuant to ERISA.  *See* Opposition at 18 (citing ERISA § 502 (g), 29 U.S.C. 1132(g)).  Here, too, Defendants do not offer anything in the way of a response to the issue of interest in their opposition papers.  As a result, the Court **AWARDS** Plaintiffs the interest they request based on their internal recordkeeping.  The Court will issue further order as to the amount of interest awarded and briefing thereon.

> b.     Plaintiffs' Claims Based on First Audit

Within the Ninth Circuit, once "trustees produce evidence raising genuine questions about the accuracy of the employer's records and the number of hours worked by the employees, the burden shifts to the employer to come forward with evidence of the precise amount of work performed."  *Brick Masons Pension Tr. v. Indus. Fence & Supply, Inc.*, 839 F.2d 1333, 1338 (9th Cir. 1988).  In order to shift the burden to the employer, the trustees must show: (1) that the employer failed to keep adequate records, (2) that some employees performed covered work that was (3) unreported to the trust funds.  *Motion Picture Indus. Pension & Health Plans v. N.T. Audio Visual Supply, Inc.*, 259 F.3d 1063, 1066 (9th Cir. 2001).  In *N.T. Audio*, the court found there was "little doubt that the Trustees met their first threshold burden" because they had submitted declarations from the auditors who had examined the records (including payroll records, timecards, and W–2s) and those auditors testified that the records were unclear and did not include required details about the nature of the work completed.  *N.T. Audio*, 259 F.3d at 1066.  Here, too, Plaintiffs have submitted a declaration from their auditor indicating that records kept by JS Taylor were inadequate and that the company owed contributions for hours that were not reported to the Trust Funds.  *See* Declaration of Andrea Williams ("Williams Decl.") at 2, Docket No. 57.  The auditor's declaration states that records (specifically union contribution reports, timecards, payroll

17

registers, certified payroll, and 1099 forms) were inspected "to ascertain if the employee is working in a classification covered by the collective bargaining agreement"; the audits concluded that covered work had been underreported and therefore that contributions were due. Williams Decl. at 3, 4.

However, Defendants note that both Ms. Williams (the auditor) and Mr. Ilacqua (one of the third-party administrators of the trust funds) concede that—although JS Taylor was found to have $24,067.23 in unpaid obligations during the period corresponding to the first inspection—it was owed a credit of $26,015.37.

| First Inspection (10/1/14- 3/31/15) | | |
|---|---|---|
| | Contribution Underpayments: | $24,067.23 |
| | 20% Liquidated Damages: | $4,813.45 |
| | 10% Interest (through 5/23/17): | $2,148.45 |
| | Over-Reported Contributions: | ($499.46) |
| | Trust Fund Credit | ($26,015.37) |
| | **Subtotal (First Inspection):** | **$4,514.30** |

*See* Opposition at 6, 8; Williams Decl. at 3; Ilacqua Decl. at 6, Docket No. 61. According the Defendants, given these amounts, "it is unclear how Plaintiffs can possibly be entitled to anything as a result of the first payroll inspection." CMSJ Opp. at 7. According to Plaintiffs, "despite the $26,015.37 credit, Defendants owed additional amounts for liquidated damages and interest incurred as a result of Defendants' underpayments on contributions." Plaintiffs' Reply in Support of Cross Motion for Summary Judgment ("Plaintiffs' Reply") at 6, Docket No. 70. Essentially, Defendants contend that the credit should offset the contribution underpayments prior to the imposition of liquidated damages and interest, while Plaintiffs contend that the damages and interest should be imposed prior to the credit offsetting unpaid obligations. At the hearing, Plaintiffs conceded that there is nothing in the Master Agreements specifying how such credits should be applied. In the absence of a rule specifying an alternative arrangement, the Court finds it fair and logical to apply the outstanding credit to the outstanding balance at the time the contributions were owed, rather than after the imposition of penalties stemming from those unpaid contributions. Since the amount of the credit owed to JS Taylor would more than offset the contribution underpayments identified by the audit, no award of liquidated damages or interest

1    would be appropriate.  As a result, the Court **DENIES** Plaintiffs' Cross Motion for Summary

2    Judgment as it pertains to the debts identified by the first audit.

3            c.     <u>Plaintiffs' Claims Based on Second Audit</u>

4       With respect to the second audit, the dispute focuses on the issuance of IRS 1099 forms by

5    JS Taylor.  In particular, the auditor inspected "Federal Tax Form 1099s for work performed by

6    non-signatory subcontractors and compensation paid by Defendants for bargaining unit work

7    (covered by the Collective Bargaining Agreement) paid outside the payroll system."  Williams

8    Decl. at 3.  The auditor includes the following information about those payments:

9          •   Sierra National Construction dba Sierra National Asphalt - $568,350.00 for

10                "Bottom Lift Fire Lane, paving contract, grind/overlay";

11          •   Autreys Water Truck & Sweeper Service Inc - $39,997.50 for "Sweeper Services";

12          •   California Cut & Core - $4,637.50 for "Flat Sawing - Asphalt & Concrete, 150 lft x

13                5" DP AC over 6" DP C/C, 150 Lft x 8" DP A/C, 900 Lft x 7" Thick A/C, Water

14                Control, Mobilization"; and

15          •   Sierra National Construction dba Sierra National Asphalt - $532,459.80 for

16                "Bottom Lift Fire Lane, paving contract, grind/overlay."

17    *See* Docket No. 57, Exh. A-B.  Based on the 1099 forms, the auditor concluded that "Defendants

18    failed to report contributions due in the total amount of $437,491.84 for hours worked by non-

19    signatory subcontractors."  *Id.*

20       However, JS Taylor contends that the 1099s at issue do not reflect "hours worked," but

21    instead reflect payments made "mainly for equipment rental and materials."  CMSJ Opp. at 8;

22    Letter from JS Taylor, Docket No. 69, Exh. J.  In assessing Defendants' contentions as to the 1099

23    forms, the Court makes two observations.  First, Defendants have not produced the 1099s, nor any

24    back-up documentation showing that the payments were not for covered work, nor any testimony

25    from the entities who received payment showing payment was for materials and equipment rentals

26    and not labor.  The documentation provided by Defendants – nothing more than an email from Mr.

27    Thiel to Plaintiffs' counsel, *see* Docket No. 69, Exh. J. – is "nothing but conclusory statements

28    without any evidence to support a legitimate audit dispute."  Plaintiffs' Reply at 7.  Second, the

letter from Mr. Thiel states that the 1099 forms are "*mainly for equipment rental and materials,*" which further suggests that the 1099s are at least partially for labor.  Mr. Thiel's email does little to negate the conclusion reached by the auditor.

Counsel for Defendants referred the Court to the *Brick Masons* case as the controlling authority.  Pursuant to *Brick* Masons, "once the trustees produce evidence raising genuine questions about the accuracy of the employer's records and the number of hours worked by the employees, the burden shifts to the employer to come forward with evidence of the precise amount of work performed." *Brick Masons*, 839 F.2d at 1338.  Through their audit, the trustees have produced evidence raising genuine questions about the accuracy of JS Taylor's records, but Defendants have not come forward with *evidence of the precise amount of hours worked*.  "Under an ordinary summary judgment analysis, . . . [Defendant's] Declaration might be enough to establish a dispute of material fact." *Dist. Council 16 N. California Health & Welfare Tr. Fund v. CreteGuard, Inc.*, No. C 10-00023 CRB, 2011 WL 996726, at *3 (N.D. Cal. Mar. 21, 2011). However, "ERISA requires every employer to maintain records on its employees 'sufficient to determine the benefits due or which may become due to such employees.'" *Id.* (quoting 29 U.S.C. § 1059(a)(1)); *see also California Serv. Employees Health & Welfare Tr. Fund v. Advance Bldg. Maint.*, No. C 06-3078 CW, 2007 WL 3232444, at *5 (N.D. Cal. Nov. 1, 2007) (granting summary judgment after finding that Defendant did not meet its burden to rebut audit evidence where it presented mere conclusory statements).

Here, Defendants have not produced sufficient evidence—not in response to the audit, not as part of their opposition to Plaintiffs' Motion for Summary Judgment, not at the hearing—to meet the requirements laid out in *Brick Masons*.  It is "Defendant's burden to show the records it kept were adequate to determine the amount it needed to contribute to the plan.  Unless it meets this burden, Plaintiff is entitled to summary judgment." *CreteGuard*, 2011 WL 996726, at *4 n.7 (citing *N.T. Audio*, 259 F.3d at 1066).  Because JS Taylor's records do not show how much in contributions is owed, the Court finds that it has failed to carry its burden.  However, given the enormous magnitude of the money allegedly owed for non-signatory subcontractor work ($458,292.23), Defendants' assertions that these payments were not included in their payroll

because they was mainly for equipment rental and materials rather than labor, and because Defendants' counsel argued that the 1099s were found outside the payroll system precisely because they were did not reflect labor costs, the Court—out of an abundance of caution—permits Defendants to come forward with evidence that shows the precise amount of hours worked under the contested 1099 forms. Any such evidence must be specific and demonstrate why summary judgment as to the second audit should not issue.

As a result, the Court **ORDERS** Defendants to show cause why Summary Judgment as it pertains to the debts identified by the second audit should not issue.

          d.      <u>Plaintiffs' Claim for Interest, Liquidated Damages, Attorneys' Fees, and Costs</u>

Plaintiffs also seek to collect interest, liquidated damages, and attorneys' fees and costs stemming from the findings of the two audits. *See* Opposition at 13–25. Given the Court's order to show cause why summary judgment as to the second audit should not issue, the Court will maintain this part of Plaintiffs' Cross-Motion for Summary Judgment under submission, pending resolution of the issues associated with the second audit.

## IV. **CONCLUSION**

In summary, the Court **DENIES** Defendant's Motion for Summary Judgment. The Court also **GRANTS** in part and **DENIES** in part Plaintiffs' Motion for Summary Judgment as follows:

- **GRANTS** Plaintiffs' Motion as it pertains to the liquidated damages associated with contributions that were late but paid prior to the filing of this lawsuit ($16,785.06);

- **GRANTS** Plaintiffs' Motion as it pertains to the liquidated damages associated with contributions that were unpaid at the time the lawsuit was filed ($39,298.31);

- **GRANTS** Plaintiffs' Motion as it pertains to the liquidated damages associated with contributions that came due but were unpaid after the lawsuit was filed ($65,075.74);

- **GRANTS** Plaintiffs' Motion as it pertains to the unpaid contributions from the months of September, October, and November 2018 ($36,548.84);

- **GRANTS** Plaintiffs' Motion as it pertains to the interest accrued by Defendants on their unpaid contributions; the Court will issue further order as to the amount of interest awarded;

- **DENIES** Plaintiffs' Motion as it pertains to the first audit; and

- **ORDERS** Defendants to **SHOW CAUSE** why Plaintiffs' Motion for Summary Judgment as it pertains to the second audit should not issue (any response from Defendants to this Order must be filed with the Court and served upon Plaintiffs within three weeks of the filing of this Order and any opposition to that filing from Plaintiffs must be filed within one week of the filing of Defendants' papers with the Court).

Where relevant, liability is imposed on both JS Taylor and Mr. Thiel individually.

The Court also **HOLDS UNDER SUBMISSION** Plaintiffs' Cross Motion as it pertains to the requested attorneys' fees, costs, liquidated damages, and interest stemming from the second audit.

This order disposes of Docket Nos. 47 and 56.


**IT IS SO ORDERED**.


Dated: November 18, 2019


_____
EDWARD M. CHEN
United States District Judge